# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## KNOXVILLE DIVISION

| | |
|---|---|
| PAUL MONTIMINY, Derivatively on Behalf of PROVECTUS BIOPHARMACEUTICALS, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) CIVIL ACTION NO. _____ ) |
| H. CRAIG DEES, TIMOTHY C. SCOTT, JAN E. KOE, KELLY M. McMASTERS, and ALFRED E. SMITH IV, | ) **VERIFIED SHAREHOLDER** ) **DERIVATIVE COMPLAINT** ) ) |
| Defendants, | ) **DEMAND FOR JURY TRIAL** ) |
| and, | ) ) |
| PROVECTUS BIOPHARMACEUTICALS, INC., | ) ) ) |
| Nominal Defendant. | ) ) ) |

Plaintiff Paul Montiminy ("Plaintiff"), by and through undersigned counsel, derivatively

on behalf of Nominal Defendant Provectus Biopharmaceuticals, Inc. ("Provectus" or the

"Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint").

Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and

upon information and belief, developed from the investigation and analysis by Plaintiff's

counsel, including a review of publicly available information, including filings by Provectus with

the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst

reports, investor conference transcripts, publicly available filings in lawsuits, and matters of

public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Provectus against certain of its officers and directors seeking to remedy the Individual Defendants' (as defined below) breach of fiduciary duties and gross mismanagement that occurred from December 17, 2013 and May 22, 2014 (the "Relevant Period") and have caused substantial harm to Provectus.

2.      The Company has suffered, and will continue to suffer, substantial financial damage.  The Company is now burdened with shareholder litigation, which has impaired the Company's reputation and caused the Company to incur millions of dollars in lost market value.

3.      Since the Company remains under the control and/or influence of the primary wrongdoers, namely the Individual Defendants (defined below) who: (a) have made decisions in violation of the business judgment rule, (b) have substantial conflicts, and (c) may be implicated in the commission of the wrongful conduct alleged herein, the Company is unable to protect itself or remedy the wrongs inflicted upon it.  Accordingly, this derivative action must be brought and vigorously prosecuted to protect and vindicate the rights of Company.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.      Venue is proper in this Court because the Company maintains its executive office in this district, a substantial portion of the transactions and wrongs complained of herein occurred in this district, and the Individual Defendants have received substantial compensation in

2

this district by doing business here and engaging in numerous activities that had an effect in this district .

## PARTIES

6.     **Plaintiff Paul Montiminy** ("Montiminy") is, and was at relevant times, a shareholder of Provectus.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

7.     **Nominal Defendant Provectus** is a corporation incorporated under the laws of the State of Delaware, which maintains its principal executive offices at 7327 Oak Ridge Hwy., Knoxville, Tennessee.   According to its public filings, Provectus is a biopharmaceutical company. Provectus' common stock trades on the New York Stock Exchange under the symbol "PVCT."

8.     **Defendant H. Craig Dees** ("Dees") is the Chairman of the Board and the Company's Chief Executive Officer ("CEO").  Dees has served as a director and as CEO since 2002.

9.     **Defendant Timothy C. Scott** ("Scott") has served as a director and the Company's President since 2002.

10.    **Defendant Jan E. Koe** ("Koe") has served as a director of Provectus since 2012. He is a member of the Audit Committee, Compensation Committee, and the Nominating Committee.  Koe was compensated $75,000 in 2013 for work as a consultant of Provectus in connection with investors relations issues.

11.    **Defendant Kelly M. McMasters** ("McMasters") has served as a director of Provectus since 2008.   McMasters is a member of the Audit Committee, Compensation Committee, and the Nominating Committee. McMasters was compensated $54,000 in 2013 for

3

work as a consultant of Provectus in connection with scientific and technical issues in clinical development.

12.     **Defendant Alfred E. Smith, IV** ("Smith") has served as a director of Provectus since 2011.  Smith is the Chairman of the Compensation Committee, Chairman of the Nominating Committee, and Chairman of the Audit Committee.  Smith was compensated $75,000 in 2013 for work as a consultant of Provectus in connection with investors relations issues.

13.     Defendants Dees, Scott, Koe, McMasters, and Smith are collectively referred to hereinafter as the "Individual Defendants."

## CODE OF BUSINESS CONDUCT AND ETHICS

14.     As members of Provectus's Board, the Individual Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

15.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Provectus, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

16.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Provectus, the Individual Defendants owed Provectus and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Individual Defendants to use their utmost abilities to control

and manage Provectus in an honest and lawful manner. The Individual Defendants were and are required to act in furtherance of the best interests of Provectus and its investors.

17.     Each director of the Company owes to Provectus and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

18.     To discharge their duties, the officers and directors of Provectus were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of Provectus were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company

maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Provectus conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

19.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Provectus, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

20.     The Individual Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition

of the Company.  As a result, Provectus has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

**SUBSTANTIVE ALLEGATIONS**

21.     Nominal Defendant Provectus is a development-stage pharmaceutical company that is primarily engaged in developing pharmaceuticals for oncology and dermatology indications.  The Company has transferred all of its intellectual property related to its over-the-counter products and non-core technologies to its subsidiaries and has designated such subsidiaries as non-core to its primary business of developing its oncology and dermatology prescription drug candidates.  The Company focuses on developing its prescription drug candidates PV-10 and PH-10.  The Company is developing PV-10 for the treatment of several life threatening cancers, including metastatic melanoma, liver cancer, and breast cancer.

**Materially False and Misleading
Statements Issued During the Relevant Period**

22.     The Company claims that PV-10 kills cancer cells when injected directly into skin cancer lesions.  Provectus has conducted one open-label phase 2 study of its product candidate, PV-10, in 80 metastatic melanoma patients.  The phase 2 PV-10 study showed a 51% response rate out of the 80 patients and was completed in May 2010.  The Company conducted end-of phase 2 meetings with the FDA in April 2010, March 2011, and October 2011.

23.     On December 18, 2013, Provectus issued a press release entitled *Provectus Type C Meeting with FDA Oncology Division held December 16, 2013.*  Defendant Dees stated in part:

> "***This meeting with the FDA is a significant step forward in establishing a pathway to initial U.S. approval of PV- 10 for the treatment of melanoma****.* There are different possible routes to approval of PV-10 such as a breakthrough therapy designation or accelerated approval, and each of these has different requirements

7

and time lines. ***I appreciate that our shareholders are eager to
receive as much information as possible, and while there is
nothing more the Company can add until it has received the
official meeting minutes, we wanted to provide this interim
update***. In addition, our discussions with several potential
international licensing partners are not affected in any way."

(Emphasis added).

24.     On January 15, 2014, the Company filed a Form 8-K with the SEC stating in

relevant part:

> Reference is made to Item 7.01 of the Current Report on Form 8-K
> of Provectus Biopharmaceuticals, Inc. (formerly Provectus
> Pharmaceuticals, Inc.) (the "Company") dated December 18, 2013
> and filed with the Commission on December 18, 2013, which is
> incorporated herein by this reference, announcing that the
> Company held a Type C meeting with the FDA Division of
> Oncology Products 2 on December 16, 2013 to discuss the
> Company's oncology drug, PV-10.
>
> Subsequently, the Company took the opportunity to provide input
> into the documentation of meeting minute notes. It is the opinion
> of the Company that this may have delayed the process of
> receiving the final meeting minute notes.  Therefore, the Company
> will communicate further guidance from the FDA once the
> meeting minute notes have been received, which is expected
> shortly.

25.     On January 22, 2014, Provectus's stock price reached its Class Period high of

$5.22 per share.

26.     On January 23, 2014, Feuerstein published an article on *TheStreet.com* entitled

*The Obsolescence of Provectus' Skin Cancer Drug Means Current Speculative Run Ends Badly*,

which stated in part:

> A speculative mania has overtaken the Pink Sheet stock Provectus
> Biopharmaceuticals PVCT, triggered by Internet message board
> and Twitter rumors that FDA officials may sanction an accelerated
> approval filing of the company's long-delayed skin cancer drug
> PV-10.

8

Provectus' stock price has soared from 80 cents per share in December to almost $6 Thursday, doubling in price in the past seven days. Volume has been off the charts. The company's market capitalization now tops $1 billion when warrants and options are included in the total share count – incredible for a bulletin board stock with less than 1% institutional investor ownership, according to S&P Capital IQ.

Provectus is doing its part to feed the hungry maws of momentum traders, issuing a cryptic press release on Dec. 18 about a meeting with FDA to discuss "possible routes to approval of PV-10 such as breakthrough therapy designation or accelerated approval . . ."

The reasons for Provectus' sit-down with the FDA and the outcome of the meeting have not been disclosed. Provectus further fueled the speculative fervor by issuing an 8-K on Jan. 15 to announce that the receipt of official minutes from the FDA meeting were delayed.

Provectus executives have now gone radio silent. Chief Operating Officer Peter Culpepper agreed to speak with me on Wednesday about PV-10 and the FDA meeting, but he cancelled a few hours before our scheduled phone call. Company spokesman Bill Gordon won't answer questions.

The notion that FDA would bend over backwards to anoint PV-10 with breakthrough therapy designation or endorse a speedy approval pathway is fundamentally absurd, even by the lower standards of today's "anything goes" biotech investment climate.

PV-10 is a diluted solution of Rose Bengal, a stain commonly used to diagnose eye disease. Rose Bengal can be purchased by the gallon from any chemical supply company, although Provectus claims PV-10 is purified Rose Bengal and somehow different.

Provectus has spent years developing PV-10 as a treatment for metastatic melanoma and other diseases. When injected directly into skin cancer lesions, PV-10 supposedly kills the tumor cells. Provectus also claims the drug has an immune system-boosting effect which kills cancer cells in "bystander lesions" not directly injected with PV-10.

The company conducted a single, open-label phase II study of PV-10 in 80 metastatic melanoma patients. The study reported a 51% overall response rate in lesions that were directly injected with PV-10. Thirty-three percent of patients also showed some tumor

9

shrinkage in bystander lesions.

Provectus completed the PV-10 phase II study in 2010, and the company has reported results at various medical meetings in subsequent years. Few, if anyone, in the medical community or on Wall Street took special notice of the PV-10 melanoma data. Provectus has never been able to secure a development partner for PV-10 despite much effort and promises by management. Until very recently, Provectus shares traded for pennies.

For almost two years, Provectus has been promising investors that a randomized, controlled phase III study of PV-10 in melanoma would be started shortly. To help design this registration-quality study, Provectus met with the FDA in April 2010, March 2011 and October 2011, according to the company's SEC filings.

27.    Later on January 23, 2014, the Company issued a letter (also filed as a Form 8-K with the SEC) responding to the article. The letter failed to address the two year delay in starting the phase 3 study of PV-10 on metastatic melanoma. The letter also failed to explain the reason for the Company's December 18, 2013 meeting with the FDA and failed to explain on what basis the FDA would consider PV-10 for Breakthrough Drug status in light of the single, small phase study. The letter attempted to support the Company's efficacy claims for PV-10 by stating:

[C]ounter to Mr. Feuerstein's claim, the Company furnished a great deal of pertinent information through its independent press agent (not spokesperson) Bill Gordon that he failed to include in his article.

One announcement, issued by Moffitt Cancer Center on August 22, 2013, highlights how early clinical trials show PV-10 can boost immune response in melanoma tumors, as well as the blood stream. Another, issued by our company on September 30, 2013, highlights important analyses of data from the completed Phase 2 study of intralesional PV-10 in metastatic melanoma as presented at the European Cancer Congress 2013 (ECCO 17- ESMO-38 - ESTRO 32) in Amsterdam, The Netherlands.

28.    On this news, the Company's stock price plummeted $3.35 per share to close at $1.87 per share on January 23, 2014, a decline of nearly 64% on volume of 30.5 million shares.

10

29.     On January 24, 2014, Feuerstein published an article on *TheStreet.com* entitled

*Provectus Still Won't Answer Key Questions About Skin Cancer Drug PV-10*, which stated in

part:

> Provectus Pharmaceuticals responded to my column about the obsolescence of its skin cancer drug PV-10 with a "letter to the editor" which was also filed as an 8-K.
>
> Read Provectus' letter closely. It's a non-denial denial which fails to address any of the concerns and questions raised in my column. Provectus executives refuse to explain the delay in starting the phase III study of PV-10 in metastatic melanoma. As I reported, it's been two years since the company told investors that it had completed meetings with FDA and was ready to seek a Special Protocol Assessment (SPA) for the PV-10 phase III study. If PV-10 is such a promising skin-cancer drug, why has Provectus been unable or unwilling to move the drug into a phase III study, as promised?
>
> Provectus also refuses to explain what made the latest meeting with FDA, held Dec. 18, necessary. The company claims an accelerated approval of PV-10 or Breakthrough Therapy designation is being considered. But on what substantive basis? As I reported, the only clinical study conducted with PV-10 in melanoma was completed four years ago and enrolled 80 patients. Does Provectus really expect FDA to consider this tiny study sufficient for an accelerated approval review? How so? Provectus won't say, which speaks volumes.

30.     Also on January 24, 2014, *TheStreet.com* published an article *titled Fisking*

*Provectus' Claims About PV-10's FDA Approval Path*, which reported in part:

> I spoke briefly with Provectus COO Peter Culpepper a few minutes ago. He wouldn't comment further on what the minutes from the FDA meeting actually say about [Breakthrough Therapy Designation ("BTD")]. The company is also not making the FDA meeting minutes publicly available, he says.
>
> Culpepper, of course, is excited about the new regulatory plan for PV-10, insisting the agency is being supportive and recognizes that PV-10 would be an entirely new treatment for patients with localized, advanced cutaneous melanoma .e. patients with skin cancer is fully accessible to treatment with an intra-lesion,

injection.

How many patients in Provectus' phase II study fit this category, meaning all their lesions were injected with PV-10?

Twenty-eight patients, said Culpepper.

So, Provectus is basing its BTD and approval strategy largely on a subset of 28 patients from an already small 80-patient phase II study. Provectus warns that it may need more clinical data:

The Agency may yet recommend and it may be in the best interest of Provectus to undertake a small, short bridging study in patients where all tumor burden can be injected. This would allow more frequent dosing than was permitted in the Phase 2 study, presumably akin to the dosing schedule currently used to treat nearly 100 patients under our expanded access protocol, and allow symptomatic endpoints to be prospectively correlated with objective response criteria.

Translated: It sounds like FDA told Provectus that it may need to run another phase II study before it runs the larger phase III study proposed two years ago. This helps explain why Provectus held the December meeting with FDA in the first place, and why the development of PV-10 has been so delayed.

31. On March 24, 2014, Provectus issued a press release entitled *Provectus Biopharmaceuticals Inc. Submits Application to FDA to Receive Breakthrough Therapy Designation for PV-10 for Treatment of Melanoma – FDA Expected to Make Determination Within 60 Days upon Receipt*, which stated in part:

Provectus Biopharmaceuticals, Inc., a development-stage oncology and dermatology biopharmaceutical company, announced today that it has applied to the FDA for Breakthrough Therapy Designation (BTD) for PV-10 for the treatment of melanoma. FDA guidelines state that the Agency will make a decision on the application within 60 days of receipt. The Agency's records for FY 2013 show that the Agency's Center for Drug Evaluation and Research (CDER) met that guideline 97% of the time.

Craig Dees, PhD, CEO of Provectus said, "The decision to apply for BTD stems from our Type C meeting held with the FDA's Division of Oncology Products 2 in December 2013. At the

meeting FDA expressed willingness to work with Provectus toward initial approval for the novel investigational oncology drug PV-10 in locally advanced cutaneous melanoma. This included a statement in the minutes that data in a cohort of patients that received PV-10 to all existing lesions should be submitted in a formal BTD application."

Dees continued, "I want to make clear to our shareholders, the media and the market as a whole that BTD is not guaranteed and if the designation is conferred on PV-10 for melanoma, it does not bypass the need for a new drug application (NDA) and review, as both are required for commercialization of any drug. As I have stated previously, the Agency may yet recommend and it may be in the best interest of Provectus to undertake a small, short bridging study in patients where all tumor burden can be injected. This could occur either before or after we have approval to sell PV-10. Provectus has over $16 million in cash reserves and would not require additional capital or the resources of a partner to conduct such a study. If such a study is conducted, it also fits with needs for an international study supportive of licensure in Australia, Europe, China and India."

Dees concluded, "We are confident that the studies done thus far illustrate the effectiveness and safety of PV-10: if you inject PV-10 into melanoma tumors, the tumors go away. For recurrent, aggressive skin cancers this unique mechanism confers tangible benefit to patients."

32.     On May 20, 2014, Feuerstein noted in an article published on *TheStreet.com* that Provectus had initially described its PV-10 drug as a "breakthrough" drug for skin cancer on its website prior to the FDA designating the drug as such. The description of the drug on the website was later amended to "investigational."

33.     Subsequently, on May 21, 2014, an investment community blog on *SeekingAlpha.com* highlighted the failure of Provectus to commence a Phase 3 trial of PV-10, and alleged that the Company was tied to a stock promotion firm whose other stock recommendations were recently halted by the SEC. The article stated in part:

- PVCT has just FOUR full-time employees, HQ appears to be a metal barn in rural Knoxville, claim to have effective treatment

13

for cancer with commodity red dye "Rose Bengal."

- PVCT is connected to questionable paid stock promoters whose other recommendations have recently been halted by the SEC: including FSPM, PHOT, and PTOG.

- Insiders were paid $49m during a 12+ year period while PVCT shareholders accumulated losses $150m with zero revenue and shares outstanding have increased 20x.

*   *   *

My research has discovered numerous issues with PVCT including:

1.  PVCT is connected to questionable stock pumpers promoting PVCT including Small-Cap Street LLC. Multiple stocks covered by Small Cap Street LLC have recently been halted by the SEC and I believe PVCT could be next to be halted given its weak disclosures and zero revenue.

2.  PVCT's PV-10 researcher Dr. Sanjiv Agarwala has a history of failure and has been sued by the SEC for insider trading. Dr. Sanjiv also recently presided over the famous VICL trial failure, resulting in VICL stock price implosion and drug abandonment.

3.  PVCT board and management are associated with multiple, very questionable paid stock promotions and companies that wiped out shareholders.

4.  The founders of PVCT's last company, Imcor Pharmaceutical Company which had the PH-10 drug, stock was also a complete shareholder wipeout.

5.  PVCT management received stated compensation of $49m since inception while paying over ten million dollars to unnamed "consultants" - all while the company has lost $150m and never generated material revenue over the past 12 years.

*   *   *

7.  PVCT's claims of PV-10 are incredulous and the lack of a credible large pharma partner taking a stake in the company or Phase 3 trials strongly indicate the drug is unviable.

14

PVCT is a reverse merger stock which up listed this week to the NYSE with an incredible $750m market cap after running up over 300% from 80 cents/share under 6 months ago. How did PVCT, a company with $0 revenue and little cash, accomplish this? I believe much of the current demand for PVCT stock is connected to questionable stock promoters potentially aimed at unsophisticated retail investors. When that promotion runs out of steam, I believe PVCT stock price will likely implode as PVCT already has achieved one of the highest market capitalizations I have ever seen for a company of this nature.

In January "Small-Cap Street" issued a report claiming PVCT is worth $62 per share written by "Osman Ghani" whose resume lists no biotech or pharma experience. Osman Ghani has recently authored numerous reports on a variety of stocks as a paid article writer, including NVLX, another penny stock paid promotion. Osman Ghani also recently wrote about PTOG, recently halted by the SEC. In fact, two other stocks covered by Paul Lipp's firms were also halted by the SEC recently (more below).

34.     On May 21, 2014, Provectus issued a press release refuting inaccuracies in the

blog on *SeekingAlpha.com*.   The release stated in part:

It has come to the attention of Provectus Biopharmaceuticals, Inc., a development-stage oncology and dermatology biopharmaceutical company (the "Company" or "Provectus"), that an article was published on seekingalpha.com on May 21, 2014, which contains numerous inaccuracies and misstatements about the Company. Without attempting to address every false statement and inaccuracy contained in the article, the Company wishes to address some of the misinformation with the following facts:

- The article alleges that the Company's oncology drug PV-10 "appears to have failed their Breakthrough Therapy Designation."  This statement is completely false.  The FDA has not reported back to the Company with respect to the Company's application for Breakthrough Therapy Designation.

- The article indicates that Provectus is "connected to questionable stock pumpers promoting PVCT including Small-Cap Street LLC."  To the contrary, Provectus is not connected in any way to Small-Cap Street LLC or any

15

other similar promoter.

- The article indicates that Provectus's patents begin expiring in 2016. In actuality, the most important patent with respect to PV-10 does not expire until 2031, and of the eight patents that expire in 2016, none of the patents relate to PV-10; seven of the patents relate to medical devices and one relates to dermatology.

- The article's summary concludes by saying "PVCT appears extraordinarily overvalued with $750 MILLION fully diluted valuation. I believe fair value is closer to $0 and outline why in this report." Because the article is based on numerous inaccuracies, this "belief" is unfounded.

The legitimacy of any article authored by a pseudonym has to be questioned. The Company is at a loss as to why individuals would be attempting to disparage the Company, but the Company will continue to proceed with our business and plans as we have in the past.

35. On this news, Provectus's stock price dropped $0.22 per share to close at $2.02 per share on May 22, 2014, a one-day decline of nearly 10% on heavy volume.

36. Finally, on May 23, 2014, trading in Provectus stock was halted at $2.02 per share, "pending news."

37. On May 27, 2014, TheStreet.com published an article titled *Provectus Executive Actions Worthy of FDA, SEC Investigations*, reporting in part:

Provectus Chief Operating Officer Peter Culpepper made several unsubstantiated claims about the efficacy and safety of PV-10 in melanoma patients on a conference call Friday evening. In my opinion, Culpepper's statements were a clear violation of FDA law, which generally forbids companies or its executives from promoting the use of experimental (unapproved) drugs without demonstrably proven clinical evidence or regulatory oversight.

Around the 25:50 mark of Friday night's conference call, Culpepper, in response to a question, says:

"The reason we will be successful is because we do have a drug [PV-10] that works. It works very well..."

16

PV-10 does not "work" for the simple reason that Provectus has never submitted a new drug application to the FDA. Only drugs that are reviewed and approved by FDA can be deemed to "work" in patients.

Later in the same call, Culpepper digs a deeper hole for himself. At around the 27:15 mark during the Q&A, an investor named Albert says, "We're saving lives here. We're saving lives." Culpepper replies, "Exactly."

Provectus has no data demonstrating PV-10 prolongs survival in melanoma patients. Provectus cannot say PV-10 is "saving lives" because no such clinical data exists.

At 27:45 of the call, Culpepper says the following about PV-10's efficacy:

"We know it's [PV-10] saving lives. We know that the patients we have treated successfully have no evidence of disease years after, so yes, this is absolutely critical we proceed and we have no questions in our minds that we will continued and be successful simply because the drug works."

Again, at the 1 hour and 3 minute mark of the call, Culpepper adds:

"There are forces out there obviously that are not in favor for whatever reason but that's not going to trump at the end of the day something that clearly works on patients and helping literally saves lives and treat disease when to our knowledge, as we know from the data, we are dealing with refractory patients who have failed other therapies and are being treated successfully with PV-10."

*       *       *

*Responding to a question on Friday's conference call, Provectus Chief Technology Officer Eric Wachter claims the company knew nothing about the FDA's PV-10 BTD decision until Weds. May 21, when he called his FDA contact person and was informed of the rejection*. Wachter explains away the five-day notification delay by claiming his FDA contact person "forgot" to call him about the rejection decision. The call on Weds. May 21 between Wachterand the FDA was followed up on the same afternoon by an email from the agency to the company with formal notification of the BTD rejection.

*Even if you believe Provectus, the FDA's decision to reject the PV-10 BTD request was known on the afternoon of Weds. May 21.*

This is significant and still troubling. On Weds. May 21 at 2:08 pm ET, Provectus issued a press release refuting details of an article published earlier the same day by Seeking Alpha. The Provectus press release states, in part, "The FDA has not reported back to the Company with respect to the Company's application for Breakthrough Therapy Designation."

Provectus admits knowing about the FDA decision on the "afternoon" of Weds. May 21, so was that before or after the company issued the denial at 2:08 pm ET?

The SEC should ask for proof. On Thursday, May 22, Provectus rang the opening bell on the New York Stock Exchange. The company celebrated its new NYSE MKT listing with the full knowledge FDA had rejected the BTD request for PV-10. Provectus hid this material information until Friday afternoon at 1:53 PM ET.

Let's not also forget Provectus removed a description of PV-10 as a "breakthrough cancer drug" from its web site on Tues. May 20.

38.    Despite receiving notification from the FDA on May 16, 2014 the Company continued to pretend it had no knowledge of the denial until May 23, 2014. Even if the Company is taken at its word, that it did not receive FDA notification until May 21, 2014, the Individual Defendants nonetheless permitted issuance of the press release refuting the *SeekingAlpha.com* post and rung then opening bell of the New York Stock Exchange on May 22, 2014 with knowledge the FDA had denied the application and without disclosing same.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

39.    Plaintiff brings this action derivatively in the right and for the benefit of Provectus to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

40.    Plaintiff will adequately and fairly represent the interests of Provectus and its

18

shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

41.     Plaintiff is a current owner of Provectus stock and has continuously been an owner of Provectus stock during all times relevant to the Defendants' illegal and wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

42.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.  Because of the facts set forth throughout this Complaint, demand on the Provectus Board to institute this action is not necessary because such a demand would have been a futile and useless act.

43.     The Provectus Board is currently comprised of five (5) members – Defendants Dees, Scott, Koe, McMasters, and Smith.  Thus, Plaintiff is required to show that a majority of the Demand Defendants, *i.e.,* three (3), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

44.     The Individual Defendants face a substantial likelihood of liability in this action because they caused Provectus to issue false and misleading statements concerning its financial results and future prospects.  Because of their advisory, executive, managerial, and directorial positions with Provectus, each of the Individual Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

45.     The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

46. The Individual Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

47. Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

48. Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

49. Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, the Individual Defendants are unable to comply with their fiduciary duties and prosecute this action. Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

50. Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their

control of Provectus.

**Demand Is Excused Because A Majority Of The Director**
**Defendants Face A Substantial Likelihood Of Liability Based Upon Their Actions**

**Defendant Dees**

51.     Defendant Dees is the CEO and the Chairman of the Board, and has been since 2002.  In his capacity as CEO, Dees was compensated $3 million in 2011, $1.2 million in 2012, and over $640,000 in 2013.  Defendant Dees' position as CEO is as a full-time employee.

52.     As a result of his duties as CEO, one of four employees of Provectus, Dees had access to detailed information regarding communications with the FDA about PV-10, the results of PV-10 studies, the Company's competitive position, and any stock promotion arrangements.  As a result, Dees was intimately acquainted with the business prospects of the Company and the prospects for success of the PV-10 Breakthrough Therapy application and was at all times aware that the true value of the Company's business was not as the public was led to believe.  Dees nonetheless was the source of certain misleading statements detailed above.

53.     Further, due to his years of experience as the Company's CEO, Dees knew that the Company's internal financial controls were deficient and the Company's statements were misleading.  In March 2014, a special litigation committee appointed by the Board to assess a derivative action alleging claims that defendant Dees had illegally granted himself options agreed to a settlement requiring Dees to re-pay certain compensation to the Company.  As a result, Dees knew that there were serious problems with Provectus' internal controls.  Due to Dees' complicity in the wrongdoing alleged herein, decision not to remedy control deficiencies of which he was aware, and his status as CEO and Chairman, he is unable to disinterestedly and independently consider a demand for litigation.  As a result, demand on Dees is futile.

**Defendant Scott**

54.     Defendant Scott is the President of Provectus and a director, and has been since 2002.  In his capacity as President, Scott was compensated $3 million in 2011, $1.2 million in 2012, and over $640,000 in 2013.  Scott's position as President is as a fulltime employee.

55.     As a result of his duties as President, one of four employees of Provectus, Scott had access to detailed information regarding communications with the FDA about PV-10, the results of PV-10 studies, the Company's competitive position, and any stock promotion arrangements.  As a result, Dees was intimately acquainted with the business prospects of the Company and the prospects for success of the PV-10 Breakthrough Therapy application and was at all times aware that the true value of the Company's business was not as the public was led to believe.  Scott nonetheless permitted the misleading statements detailed above.

56.     Further, due to his years of experience as the Company's President, Scott knew that the Company's internal financial controls were deficient and the Company's statements were misleading.  In March 2014, a special litigation committee appointed by the Board to assess a derivative action alleging claims that Scott's colleague, Dees had illegally granted himself options agreed to a settlement requiring Dees to re-pay certain compensation to the Company.  As a result, Scott knew that there were serious problems with Provectus' internal controls.

57.     Due to Scott's complicity in the wrongdoing alleged herein, decision not to remedy control deficiencies of which he was aware, and his status as President and a director, he is unable to disinterestedly and independently consider a demand for litigation.  As a result, demand on Scott is futile.


**Defendants Koe, McMasters, and Smith are Active Participants of the Audit Committee**

58.     Defendants Koe and McMasters are the members of Provectus' Audit Committee,

and Smith is the Chairman of the Audit Committee. According to its charter, the primary purpose of the Audit Committee is to insure "oversee the integrity of the Company's financial statements the Company's compliance with legal and regulatory requirements."

59. These same three defendants, Koe, McMasters, and Smith, were also simultaneously the members of the Board's other two standing committees: the Compensation Committee and the Nominating Committee.

60. In their capacities as Audit Committee members, defendants Koe, McMasters, and Smith met four times during 2013. Assuming that the Audit Committee function was as described by the Audit Committee charter, at these meetings, Koe, McMasters, and Smith reviewed: (a) detailed information regarding Provectus' business include the prospects for success of PV-10; and (b) received reports on the Company's internal Audit Function, legal compliance, and the integrity of the Company's systems of internal accounting and financial controls. However, these defendants permitted the Company to repeatedly, misleadingly describe the prospects of PV-10.

61. Further, each of these three defendants have been engaged in consulting for the Company at times they were purportedly independent. Defendant McMasters earned $54,000 in 2013 for consulting on "scientific and technical issues in clinical development." As a result, McMasters was providing additional services to Provectus that overlapped with issues in the PV-10 Breakthrough Therapy application. Defendants Smith and Koe each earned $75,000 in 2013 for consulting on "investors relations." The Company's investor relations function is directly related to the allegations herein because the Company repeatedly issued press releases refuting *TheStreet.com* and *SeekingAlpha.com* articles and posts. Additionally, any stock promotion services paid for by Provectus would have also been related to the investor relations function.

As a result, Smith and Koe each were providing services to the Company in areas that are the subject of the allegations herein. Although the Company's most recent proxy statement claims that Board of Directors "considered the payment of consulting fees" by the Company to these three defendants, and nonetheless determined them to be independent directors, the proxy statement does not explain who on the Board was in a position to opine that defendants Smith, Koe, and McMasters were independent: the only two remaining directors are insiders primarily employed by the Company. As a result, no independent committee of un-conflicted directors could have approved the self-dealing payment of consulting fees to these three "independent" directors.

62.     Due to the foregoing, these three defendants breached their fiduciary duties as Board members and as Audit Committee members by declining to halt statements that they knew to be inaccurate and misleading. Due to their breach of their duties, any demand upon defendants Koe, McMasters, and Smith is futile.

### The Entire Board Failed to Institute Sufficient
### Internal Controls and Assure Truthful Representations

63.     Defendants Dees, Scott, Koe, McMasters, and Smith, the entire Board, also breached their duty of loyalty by failing to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures and by permitting the issuance of misleading statements that they themselves knew to be untrue. Due to defendants Dees, Scott, Koe, McMasters, and Smith's course of conduct, the Company has now been seriously harmed and faces a federal securities class actions. As a result, demand is futile as to the entire Board.

64.     Each of the defendants was on the Board at times that the Company was issuing untrue and misleading statements regarding the prospects of PV-10. Although the Company's proxy statement discloses the Board only met three times in 2013, the Board took action by

unanimous written consent twenty times in 2013. Further, each of the five (5) Board members have detailed knowledge regarding the development of PV-10 and/or the Company's disclosure and investor relations functions, such that they could not have been unaware of the improper disclosures: (a) Dees is CEO and Scott is President, and these two defendants together are two of the Company's four employees; (b) defendant McMasters was engaged in consulting on scientific and technical issues in clinical development; and (c) defendants Koe and Smith were engaged in consulting with respect to investor relations. Due to their participation in Board meetings and actions by unanimous consent, all defendants reviewed legal and compliance issues, reviewed the Company's internal controls, and disclosures. All defendants thus knew that the Company's internal controls were woefully deficient and declined to disclose that fact or to take action to fix the internal controls.

65. Further, on January 23, 2014 and May 21, 2014, the Company issued disclosures publicly refuting the allegations of the financial press and financial bloggers. As of the issuance of these statements, each of the Defendants was on notice of the allegations against the Company, and either: (a) investigated and knew the Company's disclosures to be false; or (b) consciously declined to investigate but nonetheless were aware of the allegations.

66. After the Breakthrough Drug application for PV-10 was denied on May 16, 2014, Defendants concealed same for nearly a week. A majority of the Board could not have been unaware of the FDA's denial: (a) Dees and Scott were two of the Company's four employees; and (b) defendants Koe, McMasters, and Smith were members of the Audit Committee with oversight responsibilities relating to the Company's financial risk and public disclosures.

67. The wrongdoing detailed herein violates the fiduciary duties owed by Provectus' directors and are incapable of ratification. As a result, demand is excused as to the entire Board.

68.     As particularized herein, to properly prosecute this lawsuit, Defendants would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to tens of millions of dollars in civil liability and/or sanctions.  This they have refused to do thus far, and will not do in the future.   A majority of the Defendants are exposed to potential liability for breaching their fiduciary duties by consciously or recklessly declining to institute functioning internal controls even though they knew or were reckless in not knowing that the Company's internal controls were seriously deficient and accounting chicanery was rampant.  Thus, demand on Defendants is futile.

## FIRST CAUSE OF ACTION

### Against The Individual Defendants for Breach of Fiduciary Duties

69.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

70.     The Individual Defendants owe Provectus fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Provectus the highest obligation of good faith, fair dealing, loyalty, and due care.

71.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

72.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent and overstate its profits and failing to correct the Company's publicly reported inaccurate financial guidance.   These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

73.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Provectus has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

74.     As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, Provectus has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of Provectus, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants for Gross Mismanagement

75.     Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

76.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Provectus in a manner consistent with the operations of a publicly held corporation.

77.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Provectus has sustained significant damages in excess of hundreds of millions of dollars.

78.     Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all the Individual Defendants and in favor of Provectus, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.     Directing Provectus to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.


## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: October 24, 2014

BRAMLETT LAW OFFICES

*s/Paul Kent Bramlett*
PAUL KENT BRAMLETT #7387
ROBERT PRESTON BRAMLETT #25895
P. O. Box 150734
Nashville, TN 37215
Telephone: (615) 248-2828
Facsimile:  (866) 816-4116
Email: PKNASHLAW@aol.com
Email: Robert@BramlettLawOffices.com

THOMAS J. MCKENNA
GREGORY M. EGLESTON
**GAINEY McKENNA & EGLESTON**
440 Park Avenue South

New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0380
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***